Minute Order Form (6/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | James B. Zagel | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 98 C 6610 | **DATE** | 6/19/2001 |
| **CASE TITLE** | WOLZ vs. THE DEATON-KENNEDY COMPANY | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ■ Status hearing set for 7/19/2001 at 10:00 A.M...
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)   ☐ General Rule 21   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).
(10) ■ [Other docket entry]   **Motion (19-1) for summary judgment is granted/denied in part. Motions (25-1 and 26-1) to strike are denied.**

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | Document Number |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | |
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | JUN 2 0 2001 | |
| | Notified counsel by telephone. | | date docketed | |
| ✓ | Docketing to mail notices. | | | |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | FILED FOR DOCKETING | | |
| DW | courtroom deputy's initials | 01 JUN 19 PM 2:27 | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

KAREN WOLZ,

    Plaintiff,

v.

THE DEATON-KENNEDY COMPANY,

    Defendant.

No. 98 C 6610
Judge James B. Zagel


DOCKETED
JUN 2 0 2001

## MEMORANDUM OPINION AND ORDER

This is a sexual harassment, pregnancy discrimination, and failure to accommodate disability case. Karen Wolz worked as a Pricing Administrator for Deaton-Kennedy, a printing business that specializes in printed materials for the funeral industry. She alleges harassment at the hands (and lips) of a factory foreman, termination on account of her pregnancy and pregnancy-related medical conditions, and the failure to accommodate her fibromyalgia. Summary judgment is appropriate if, evaluating the admissible evidence in the light most favorable to Wolz, there is no genuine issue of material fact and Deaton-Kennedy is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513 (1986). Unless otherwise stated, the discussion below accepts Wolz's version and characterization of events.

**Sexual Harassment**

In order for the harassment claim to be actionable, it must concern conduct which occurred within 300 days of the filing of a charge with the EEOC. In this case, Wolz filed with

the EEOC on October 2, 1996. Harassment that predates December 8, 1995 cannot form the basis of Wolz's claim.

Beginning in 1992, Bob Mackey rubbed Wolz's bra strap and the sides of her breasts, gave female employees Christmas kisses (Mackey put his tongue in Wolz's mouth), and joked about her breast size. Wolz complained about Mackey in 1993 and her supervisors, Mike Avon and Bob Hoaglund, laughed and said, "Well, you know that is Bob," and "Oh, you know, that's our Bob." Wolz went on medical leave on January 6, 1996 and did not return to active duty. Wolz was on medical leave, then maternity leave, then vacation and personal leave until she was terminated on June 12, 1996.

The timing of harassment is crucial to the viability of Wolz's claim. During discovery, after a surprising turn of events, Wolz revealed specific information about the dates of harassment. Plaintiff was first deposed in December of 1999. In January, 2000, Wolz got a job with an insurance agency. The job was short-lived and after her termination, Wolz took an overdose of prescription medication. She was treated at a hospital. Later that year, in April, Wolz again took an overdose and again went to the hospital. Also in April, Wolz got a job as an assistant clerk. Plaintiff's employment and medical history subsequent to her first deposition were relevant to her claim of disability and her assessment of damages related to her employment at Deaton-Kennedy. On that basis, I allowed a second deposition so defendant could question Wolz about her jobs and medical records.

Defendant questioned Wolz about the connection between her apparent suicide attempts and her employment at Deaton-Kennedy. Wolz said she attributed her suicide attempts to

Deaton-Kennedy, which led defendant to ask her why one of her doctors did not record any complaint attributing her mental state to sexual harassment. Defense counsel said, "I'm trying to find out whether around the time you became pregnant with Shannon in June of 1995 had the sexual harassment that you complained about ended such that you wouldn't be making those complaints to Dr. Novakas?" Wolz answered, "Yes." Plaintiff's Deposition 440.

Plaintiff implicitly concedes that this admission ends her harassment case (June 1995 is more than 300 days before October 2, 1996) -- she argues that the testimony should be disregarded because it was beyond the scope of the deposition. She does not argue that she was mistaken or point to specific evidence that shows harassment occurring after June, 1995. But see note 1, *infra*. She does not propose an exception to or tolling of the 300 day limitations period.

The objection is overruled. The question and answer, while not directly related to Wolz's hospitalizations in 2000, are sufficiently related to Wolz's damages claim attributing her suicide attempts to Deaton-Kennedy. Counsel was within the scope of the second deposition when he explored Wolz's basis for this attribution. The question and answer stand.

The harassment occurred well over 300 days prior to filing the EEOC charge and is time barred. I grant summary judgment to the defendant on the sexual harassment claim.[1]

**Pregnancy Discrimination**

---

[1] I also note that even if harassment occurred after June, 1995, the only actionable harassment must have occurred between December, 1995 (the 300 day mark) and January, 1996 (the date plaintiff left active employment at Deaton-Kennedy). Wolz says "on nearly a daily basis, if Wolz was near a filing cabinet, Mackey would back her into it." Plaintiff's Statement of Additional Facts ¶ 7. This conclusory statement, which purports to cover Wolz's entire tenure at Deaton-Kennedy, is insufficient for a reasonable trier of fact to find the kind of severe or pervasive harassment (in December and early January) that Title VII prohibits. For this alternative reason, summary judgment is appropriate.

3

In June, 1995, Wolz became pregnant and announced the pregnancy in September. Her supervisor, Bob Hoaglund, told her "it had better be a quick leave to have the baby." Wolz had a pregnancy-related condition of thrombosed hemorrhoids which required her to miss work for doctor appointments. Hoaglund told her she was "letting the office down" and that "most pregnant women don't have as many doctor appointments as you do." Because of her complications, Wolz requested and received medical leave from January 5, 1996 until she delivered the baby. Wolz had the baby on March 26, 1996. Before she was able to return to work, Wolz learned that she needed gallbladder surgery and told Mike Avon this on May 31, 1996. She told Hoaglund on June 11, 1996. On June 12, 1996, Wolz received a letter terminating her employment.

Prior to Wolz's termination, Hoaglund told her that upon her return from maternity leave, she would have a new position with Deaton-Kennedy, a Sample Position. One of the benefits of this position, Hoaglund noted, was a "more flexible schedule with children and new baby." Hoaglund also noted that with this new position "if [Wolz] needs to miss a day because of child care it would not be critical."

The Pregnancy Discrimination Act amended Title VII to require employers to treat pregnant women the same as all other persons. To prevail on a PDA claim, plaintiff must show she was treated differently because of her pregnancy; she must show that pregnancy was a motivating factor for an adverse employment decision. *Maldonado v. U.S. Bank*, 186 F.3d 759, 763 (7th Cir. 1999). However, if an employee "cannot work because of illness, nothing in Title VII requires the employer to keep the employee on the payroll." *Troupe v. May Department Stores*

4

Co., 20 F.3d 734, 737 (7th Cir. 1994). An employer does not have to treat an employee with pregnancy-related illnesses any better than an employee with an illness generally. *Id.*

Wolz says Hoaglund's comments are evidence of discriminatory intent. Defendant's initial response is to move to strike Hoaglund's comments. Not until her post-deposition affidavit did Wolz report that Hoaglund made the "quick leave," "letting the office down" and doctor appointment comments to her. At her deposition, Wolz said Bob Hoaglund subjected her to harassment of a non-sexual nature by telling her that people did not like her and that her work was never good enough. Defendant asked Wolz if there was anything else and Wolz answered, "No." Defendant says Wolz's new affidavit is an effort to patch up prior testimony and should be disregarded. See *Shepherd v. Slater Steels Corporation*, 168 F.3d 998, 1007 (7th Cir. 1999). By phrasing the question in terms of "harassing" comments, I do not think counsel adequately closed the door to preclude Wolz from adding testimony concerning pregnancy discrimination. Obviously, it is extremely odd that these comments did not come to light at the deposition, but I cannot say they are squarely inconsistent with or a retraction of deposition testimony. The motion to strike the affidavit is denied.

Unfortunately for Wolz, Hoaglund's comments are not sufficient to defeat summary judgment. The comments and the surrounding circumstances of Wolz's termination suggest, at most, that excessive leave was a motive to terminate Wolz; from the timing of the termination, one could infer that gallbladder surgery was the last straw for Deaton-Kennedy.[2] But this is not evidence of pregnancy discrimination. "An employer can dismiss an employee for excessive

---

[2] Another possible motive to fire Wolz is her disability, discussed below.

5

absenteeism, even if the absences were a direct result of the employee's pregnancy." *Maldonado*, 186 F.3d at 766; see also *Geier v. Medtronic, Inc.*, 99 F.3d 238, 242 (7th Cir. 1996).[3] Hoaglund's notes, indicating the new Sample Position would give Wolz family-friendly flexibility in her schedule, are not evidence of pregnancy discrimination either. I take it Wolz infers these comments were patronizing, but even if such an inference were reasonable, it does not suggest a reason to terminate -- the adverse action at issue. A statement that family responsibilities can be accommodated is not evidence that an employer intends to fire an employee for getting pregnant.

Even if Wolz does not have evidence of discriminatory intent, she may survive summary judgment by stating a prima facie case. See *Maldonado*, 186 F.3d at 763. The prima facie case requires a showing that: 1) Wolz is a member of the protected class; 2) she satisfactorily performed her duties; 3) defendant terminated her; and 4) treated other persons not in the protected class more favorably. Defendant argues that plaintiff has failed to raise an issue on either the first or fourth elements.

Since Wolz delivered her baby in March and the termination occurred in June, defendant says Wolz was no longer a member of the protected class (pregnant women) at the time of termination. The statute is not so narrow. See *Piraino v. International Orientation Resources, Inc.*, 84 F.3d 270, 274 (7th Cir. 1996) (calling defendant's argument "rather surprising"). The protected class includes women with pregnancy-related medical conditions. See 42 U.S.C. § 2000e(k); see

---

[3] There may be a fine line between discrimination on account of absenteeism and discrimination on account of pregnancy-related medical conditions. The key to the distinction is some showing that medical conditions that are unrelated to pregnancy are treated more favorably than pregnancy-related conditions. Hence the final element of the *McDonnell Douglas* prima facie case requires plaintiff to show she was treated differently than other persons outside her protected class. *Geier*, 99 F.3d at 243; see generally *McDonnell Douglas, Corp. v. Green*, 411 U.S. 792, 802 (1973).

also *Gaugaix v. Laboratoires Esthederm USA, Inc.*, 2000 WL 1528212 * 5 (S.D.N.Y. 2000); *Fejes v. Gilpin Ventures, Inc.*, 960 F. Supp. 1487, 1493 (D. Colo. 1997). In this case, Wolz says her gallbladder surgery was pregnancy-related, and that she told Deaton-Kennedy it was. I must take her word for it, so she sufficiently states the first element of the prima facie test.

Wolz does not, however, offer any evidence that similarly situated non-pregnant employees were treated more favorably. Her replacement, Christine Sturm, was not pregnant, but there is no evidence that Sturm was otherwise similarly situated. For example, there is no evidence that Sturm took as much leave as Wolz did. See *Geier*, 99 F.3d at 243 (plaintiff failed to show an employee "with a similar track record" was treated more favorably). Sturm became pregnant, worked during her pregnancy, received six weeks maternity leave, and returned to the Sample Position. Wolz was on leave from January until June, 1996. To raise an inference of pregnancy discrimination, she must make some showing that a similar amount of leave by a non-pregnant person did not lead to termination or adverse action. She has not done this, and therefore fails to state a prima facie case of discrimination. I grant the motion for summary judgment on the pregnancy discrimination claim.

**Disability Discrimination**

The heart of this case is disability discrimination – it seems to me that Wolz's real difficulty with her employment at Deaton-Kennedy (at the time of her termination) was her fibromyalgia. She had concerns about the Sample Position job because it involved work that she believed she could not perform. She voiced these concerns to her supervisors, and they in turn discussed her health and its relationship to her work with both Wolz and her treating physician,

7

Dr. Maria Sosenko. Apparently, Deaton-Kennedy and Wolz could not come to an arrangement and Wolz was fired.[4]

Fibromyalgia is a condition of diffuse muscoskeletal pain associated with fatigue and impaired sleep. Defendant does not dispute that fibromyalgia is a recognized medical condition and that Wolz suffers from it. The disease is a mysterious one, with causes and cures unknown and entirely subjective symptoms. See generally *Sarchet v. Chater*, 78 F.3d 305, 306 (7th Cir. 1996). Dr. Sosenko diagnosed Wolz with fibromyalgia in December, 1994. At the time, Wolz suffered from bouts of severe pain in her neck, shoulders and back. Wolz sometimes experiences difficulty standing or bending when, for example, doing the laundry or dishes. At Deaton-Kennedy, her neck, hands and shoulders hurt from pulling samples.

On November 21, 1995, Hoaglund told Wolz about the new Sample Position that would be her job upon her return from maternity leave. This job would require gathering papers, walking around a table, and standing and bending over file cabinets. Wolz mentioned her fibromyalgia to Hoaglund, and he requested a letter from her doctor. Dr. Sosenko sent a letter recommending a "sit down" job that did not require standing or bending for a long period of time. Hoaglund replied requesting additional information. Wolz did not know that Hoaglund was communicating directly with Sosenko. After she gave birth, Wolz called Hoaglund to inquire about her job and asked if she would be able to continue her Pricing Administrator job. Hoaglund said he didn't know what her job would be. On May 28, 1996, Wolz came into the office and met with Hoaglund. He told her the only job for her was the Sample Position and gave

---

[4] Wolz does not claim her fibromyalgia is a pregnancy-related condition; therefore, if Deaton-Kennedy fired her because of fibromyalgia, the termination was not an act of pregnancy discrimination.

her a list of position responsibilities. Hoaglund also requested another letter from Sosenko. On May 31, 1996 Wolz spoke with Mike Avon and told him she may not be able to do the Sample Position. It was in this conversation that Wolz told Avon she would need gallbladder surgery.

Defendant says it attempted to accommodate Wolz upon learning of her fibromyalgia in November, 1995. It purchased new office furniture and filing cabinets and asked Wolz to look at the new set-up. Wolz says the new furniture had nothing to do with her condition; Hoaglund planned on purchasing new furniture months before Wolz told him she had fibromyalgia. Hoaglund said that he requested a desk and chair that would minimize Wolz's need to twist and turn, something she had complained about. Hoaglund Dep. 142-147. In general, however, it is clear that Hoaglund wanted "to make a working area that would be conducive to anyone that would be doing that job" whether or not Wolz was the one in the position. Hoaglund Dep. 153.

The June 12, 1996 termination letter (signed by Hoaglund) states: "You [Wolz] indicated that you would not be able to do 75% of the work involved in this job [the Sample Position] and have declined to come back to Deaton-Kennedy Company in this position.... We are therefore going to fill this position with another person and must advise you that at the present time there is no position which you can fill at the Deaton-Kennedy Company. Therefore, you are discharged as an employee of the Deaton-Kennedy Company effective immediately." Wolz denies that she declined the job; she says she told Avon that doing the Sample Position full time would cause too much pain and that she would identify which duties she could and could not perform. Wolz says Deaton-Kennedy never offered a part-time or modified Sample Position; Deaton-Kennedy says Wolz never asked.

Wolz eventually got a job at Morris Hospital as an outpatient registration clerk. She worked five days a week, from 11:00 a.m. to 8:00 p.m., registering patients, filing and cleaning counters. Wolz admits that there were never any job duties or responsibilities at Morris Hospital that she could not perform because of her fibromyalgia; she did not tell anyone there that she had physical limitations. She left Morris Hospital to work for a doctor, Dr. Vienne, as a receptionist, a 9:00 a.m. to 5:00 p.m. job. She worked five days a week at a desk, pulling and filing patient charts. Dr. Vienne knew Wolz had fibromyalgia, but they had no discussions about her physical limitations in connection with her work. Wolz did not ask for any accommodations for her fibromyalgia at Dr. Vienne's office.

Deaton-Kennedy makes two arguments in support of its motion for summary judgment on this claim. First, it says Wolz is not disabled as defined by the ADA. Second, it says Wolz failed to engage in the interactive process of determining a reasonable accommodation.

The relevant definition of disability is: "a physical or mental impairment that substantially limits one or more of the major life activities of such individual." 42 U.S.C. § 12102(2)(A). There are three steps to determining disability. First, is the condition a physical or mental impairment? The answer here is clearly yes. Second, what is the life activity upon which plaintiff relies, and is it a major life activity? Third, does the impairment substantially limit that major life activity?[5]

Wolz identifies two life activities at issue. The first is "working." "Working" is a major life activity in this circuit. *Sinkler v. Midwest Property Management Limited Partnership*, 209 F.3d

---

[5] Defendant does not argue that even if Wolz is disabled, she is not a "qualified individual with a disability." See *DePaoli v. Abbott Laboratories*, 140 F.3d 668, 674 (7th Cir. 1998). Therefore, I limit my inquiry to the question of disability only.

10

678, 685 & n. 1 (7th Cir. 2000). So, does Wolz's fibromyalgia substantially limit her working? To answer this affirmatively, I must have some evidence that the impairment substantially limits employment generally, not just the specific job of Sample Position at Deaton-Kennedy. Wolz has the burden of presenting evidence to identify how her impairment limited an entire class or broad range of jobs. Wolz was able to work at Morris Hospital and for Dr. Vienne. She was not limited in these jobs at all. Nevertheless, Wolz argues that she "is precluded from performing any job that requires physical activity such as extensive or repetitive filing, lifting and carrying, including many secretarial jobs." Plaintiff's Mem. 13. The evidence does not support the argument. Sosenko was asked whether Wolz was incapacitated from a broad range of jobs, and she said she was. The basis for her opinion, however, was only that Wolz was unable to perform the job that she had. Sosenko Dep. 161. Dr. Sosenko does not provide evidence to support a finding that Wolz is precluded from a broad range of jobs.[6] Wolz's own job history suggests she is not so precluded. At most, the evidence suggests some vague subset of clerical work that Wolz cannot do. This is not enough evidence to identify a broad class of jobs that Wolz was unable to perform. There is not a genuine issue as to whether Wolz's condition substantially limited her ability to work; it did not.

The second major life activity relied upon by Wolz is the set of tasks of lifting, pulling, pushing, bending and reaching. An EEOC regulation says "Major Life Activities means functions

---

[6] In general, Dr. Sosenko is "very anti-disability for fibromyalgia patients." Sosenko Dep. 160. Obviously, Dr. Sosenko is not a lawyer and is not competent to opine on the relationship between fibromyalgia and the definition of disability within the ADA. However, given her "anti-disability" position, it is not surprising that she does not offer opinions on job classifications, or the range of jobs that her patients can or cannot perform. Sosenko did not order the breadth of restrictions that generally supports a finding that a condition substantially limits the ability to work. See *DePaoli*, 140 F.3d at 673; *Cochrum v. Old Ben Coal Co.*, 102 F.3d 908, 911 (7th Cir. 1996).

11

such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i). The Appendix to this regulation says this list is not exhaustive and includes "sitting, standing, lifting, reaching." 29 C.F.R. Pt. 1630, App. Defendant does not dispute that lifting, pulling, pushing, bending and reaching constitute major life activities, therefore I will assume, without deciding, that they are.

Wolz again cites to Dr. Sosenko to support her claim that she is substantially limited in these areas and again, Sosenko's testimony is too vague (by itself) to support her claim. Sosenko said Wolz was substantially limited in pulling, pushing, bending and lifting. Sosenko Dep. 154. But she also said she could not say with any certainty what the duration of this substantial limitation was. Sosenko Dep. at 158. She did testify that the limitations were not constant; "some days [Wolz] would be, some days she would not be." Sosenko Dep. 154. Sosenko also testified that she had no opinion as to whether Wolz was substantially limited in pulling and pushing. Sosenko Dep. 146. At most, Sosenko's testimony demonstrates that it is likely that Wolz's fibromyalgia substantially limited her lifting, standing and bending at times, but for completely unknown duration. This is not sufficient to allow a trier of fact to make a finding of disability. But perhaps in combination with her own testimony, Wolz has enough to survive summary judgment.

Wolz says she needs help doing household chores, and she cannot lift her infant into a crib or onto a changing table. Plaintiff described some pulling, bending and lifting that she was able to do at Dr. Vienne's office. She "pulled" charts from shelves, pulled drawers open, lifted charts onto her desk and onto a wheeled cart, pushed the wheeled cart and picked charts up off the floor.

12

She would spend 2 or 2 ½ hours a day "pulling the charts, taking them off the shelves, putting them on the carts, compiling the new papers on the charts, and taking them back to the nurses' station." Wolz Dep. 117. In her subsequent affidavit, Wolz stated that only 10-15 minutes were spent pulling charts and the compiling of paper took 2 to 2 ½ hours. Wolz Affidavit ¶ 47. I accept the affidavit, as well as Wolz's description of her inability to perform certain household chores.[7]

Wolz is quite clearly able to push, pull, bend, lift, etc. to some degree. So, the question becomes whether Wolz has sufficient evidence to show that she is "significantly restricted as to the condition, manner or duration under which" she can push, pull, bend, lift, etc. as compared to the average person. See 29 C.F.R. § 1630.2(j)(1)(ii). Not surprisingly, all Wolz has is her testimony, but that is the very nature of fibromyalgia. The condition is based entirely on the patient's subjective complaints. Wolz does not have much, but she has enough to survive a motion for summary judgment. It will be up to a trier of fact to determine how credible this testimony is when compared with her ability to push, pull, bend, lift, etc. in other contexts, such as Dr. Vienne's office (and when compared to the average person). There is a genuine issue of fact on the question of whether Wolz is substantially limited in her ability to life, pull, push, bend and reach. Therefore, there is a genuine issue on the question of whether Wolz is disabled under the ADA.

---

[7] On the issue of pulling charts, the deposition question and answer did not break down each task performed at Dr. Vienne's office; instead counsel provided a list of tasks that cumulatively took 2 to 2 ½ hours. The affidavit is not inconsistent with this testimony; it merely separates the task of pulling charts. The motion to strike is denied.

13

Defendant next argues that it is entitled to summary judgment because Wolz was responsible for the breakdown of the interactive process of finding a reasonable accommodation for her fibromyalgia. See *Beck v. University of Wisconsin Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir. 1996). The ADA requires employers and employees to cooperate with one another to find an accommodation, if possible, for the employee's disability. If the employee causes a breakdown in this process by, for example, failing to communicate with her physician to obtain a comprehensive letter outlining her restrictions, then the employer cannot be held liable. *Steffes v. Stepan Co.*, 144 F.3d 1070, 1073 (7th Cir. 1998). The interactive process is not an end in itself; it is a means for determining what reasonable accommodations are available. If the employer caused the breakdown in the process, the plaintiff must allege that this breakdown resulted in a failure to identify an appropriate accommodation. *Rehling v. City of Chicago*, 207 F.3d 1009, 1015 (7th Cir. 2000).

There is too much in dispute on this record for me to identify, as a matter of law, who was at fault for the communication breakdown. Deaton-Kennedy says Wolz quit because she would not be able to do the job. Wolz says she wanted to identify those duties she could perform and see if something could be worked out. Wolz denies quitting. It is clear that some communication was occurring. Hoaglund spoke with Wolz, received letters from Sosenko, and even looked fibromyalgia up in a medical encyclopedia he had at home. The process did not get far enough "so that, together, [employer and employee] might identify the employee's precise limitations and discuss accommodations which might enable the employee to continue working." *Hendricks Robinson v. Excel Corp.*, 154 F.3d 685, 693 (7th Cir. 1998). To some degree, it seems we still do

not know Wolz's precise limitations, and this is information that only Wolz has. Her own physician is unable to identify what Wolz's lifting limitations are. In terms of the interactive process, however, I cannot tell who dropped the ball. See *EEOC v. Yellow Freight System, Inc.*, -- F.3d --, 2001 WL 641800 *15 (7th Cir. 2001) (Wood, J., dissenting in part, concurring in part). Wolz has enough evidence to allege that the failure to communicate resulted in a failure to identify an appropriate accommodation. Since Deaton-Kennedy planned to remodel the office anyway, see page 9, *supra.*, a trier of fact could find that it was not an accommodation. No other alternatives were proposed (the discussions stopped). Summary judgment is denied.

**Conclusion**

Defendant's motion for summary judgment [19-1] is granted in part, denied in part. I dismiss the sexual harassment and pregnancy discrimination claims. The ADA claim survives. Defendant's motions to strike [25-1, 26-1] are denied.

ENTER:

James B. Zagel
United States District Judge

DATE: 19 June 2001

15